**JOHN LECROY & SON, INC.,**
Plaintiff,

v.

**LANGIS FOODS, LTD., Defendant.**

**Civ. A. No. 1353–73.**

United States District Court,
District of Columbia.

May 29, 1974.

George Gottlieb, New York City, Donald L. Dennison, for plaintiff.

Francis W. Guay, Washington, D. C., for defendant.

## OPINION

HART, Chief Judge:

This case arises on plaintiff's motion for summary judgment, and appears to be a case of first impression concerning the interpretation of § 44(d) of the Trade Mark Act of 1946 in the context of an *inter partes* proceeding.

The defendant, Langis Foods Limited ("Langis"), is a Canadian corporation organized under the laws of British Columbia. Langis filed applications in Canada to register the trademarks APPLE TREE, LEMON TREE, and ORANGE TREE on March 28, 1969. The names were to be applied to dry crystals which when mixed with water would create a fruit beverage. When the Canadian applications were filed, Langis had not used these marks in either Canada or the United States.

Plaintiff, John Lecroy & Son, Inc. ("Lecroy") is a United States corporation organized under the laws of the state of New Jersey. Sometime during May of 1969 Lecroy began to use the trademark LEMON TREE in the United States for a fruit beverage similar to that produced by Langis.[1] On June 18, 1969, plaintiff filed his application with the Patent Office to register the mark LEMON TREE.

[1]. In pleadings filed with the Patent Office plaintiff claimed first use of LEMON TREE in the United States on May 15, 1969. Defendant's application papers in the Patent Office show a first use in Canada of the same mark on May 15, 1969. Although the Patent Office found that plaintiff's use dated from May 1969, it erroneously stated that defendant had made no use of the mark in Canada.

On September 19, 1969, defendant filed applications with the United States Patent Office to register all three of its marks, APPLE TREE, LEMON TREE, and ORANGE TREE. At the time of this filing Langis had never used any of the marks in the United States, but stated a claim of priority under § 44(d) of the Trade Mark Act of 1946 (the "Act"). The priority claimed would give Langis an effective application date of March 28, 1969.

While all the applications for registration were pending in the Patent Office, plaintiff began to use the marks ORANGE TREE and LIME TREE in commerce in June of 1970. Plaintiff's applications to register these two marks were filed with the Patent Office on July 22, 1970.

Subsequently in August, 1971 the Patent Office published the defendant's marks APPLE TREE and ORANGE TREE in its "Official Gazette" for purposes of opposition. On October 26, 1971, the Patent Office issued Registration No. 922,869 for defendant's mark LEMON TREE.

Shortly thereafter, Lecroy instituted oppositions to defendant's APPLE TREE and ORANGE TREE and filed a petition to cancel the registration of LEMON TREE. In a written opinion issued May 7, 1973, the Trademark Trial and Appeal Board ("Board") denied plaintiff's petition to cancel the registration of LEMON TREE and dismissed the oppositions to APPLE TREE and ORANGE TREE. Application was made to this Court for review of the Board's decision that pursuant to § 44(d)

". . . [Langis] is entitled herein as a matter of right to rely upon the filing dates of its Canadian applications, i. e. March 28, 1969, and hence that it possesses superior rights in its marks as against [Lecroy]."

The question which this Court must decide is whether, in the context of an *inter partes* proceeding before the Trademark Trial and Appeal Board, a foreign applicant seeking to register a trademark in the United States may obtain a registration based on a priority use date pursuant to § 44(d) when such trademark has never been used in the United States.

Specifically, the controversy in the instant case arises over that portion of § 44(d) which provides that an application for registration by a foreign national who has previously filed an application for registration of the same mark in his home country ". . . shall be accorded the same force and effect as would be accorded to the same application if filed in the United States on the same date on which the application was first filed in such foreign country . . ." Defendant relies primarily on Articles 2, 4 and 6 of the self-executing International Convention for the Protection of Industrial Property (Paris Union Treaty) for the proposition that where a foreign applicant applies for registration of a mark not previously used in commerce in the United States, but which is the subject of an application for registration in a foreign country, the Treaty automatically awards such applicant a use date in the United States of the date of the foreign application. Article 2 states in part:

"(1) Nationals of each of the countries of the Union shall, as regards the protection of industrial property, enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals . . ."

■ This Article provides no basis for the granting of superior, substantive rights to foreign nationals. The only requirement of this Article is that the *same* rights and advantages available to citizens of one signatory country be *equally* available to foreign nationals from other signatory countries. See Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633 (2nd Cir. 1956). This principle is clearly explained in In re Lowenbrau Munchen, 175 U.S.P.Q. 178, 180

(1972) where the Trademark Trial and Appeal Board interpreted Article 2 of the Convention:

"Thus, Article 2 provides, in effect, that nationals of the countries which have ratified the Convention may, *upon compliance with the requirements of the Trade Mark Act of 1946, register their marks in the United States in the same manner and with the same legal effect as United States* nationals, even though no domicile or commercial establishment is maintained in the United States." (Emphasis added)

Defendant also relies on Article 6 of the Convention, which reads in part:

"Every trademark duly registered in the country of origin shall be accepted for filing and protected in its original form in the other countries of the Union . . ."

In the case of Ex Parte Societe Fromageries Bel, 105 U.S.P.Q. 392 (1955), the Patent Office considered this particular Article in relation to the registration of a foreign trademark based on a foreign registration, § 44(e) of the Act. The Board held that no use of the mark had to be shown when the registration was based on a foreign registration, thus in effect conferring a blanket reciprocity of trademark registrations to citizens of signatory countries.

This decision, the so-called "Merry Cow" case, was widely criticized, but remained Patent Office policy until the opinion in In re Certain Incomplete Trademark Applications, 137 U.S.P.Q. 69 (1963) which expressly rejected the "Merry Cow" doctrine. The case arose subsequent to the adoption of Rule 2.39 of the Rules of Practice in Trademark Cases which exempted foreign applicants from making allegations that the mark is used in commerce and from statements of the dates of the applicant's first use of the mark. The question was whether applications which alleged no use whatsoever could continue to be accepted under the "Merry Cow" decision. The Patent Office said "No."

In the course of the opinion Commissioner Fay developed a substantial and scholarly analysis of the meaning and purpose of Article 6 of the Convention. See Footnote 8 at 137 U.S.P.Q. 72. His conclusion was that Article 6 does not and never did control the conditions and formalities required by a country for obtaining a registration. This conclusion was reached by an examination of the original Convention proceedings which revealed that the delegates intended Article 6 to eliminate possible objections to trademarks because of the inherent nature or form of the mark itself. Moreover, this interpretation is supported by an amendment to Article 6 which became effective in 1962 and reads:

"(1) The conditions for the filing and registration of trademarks shall be determined in each country of the Union by its domestic law."

In "Merry Cow" the Patent Office expressed concern with imposing upon foreign nationals "the burden of conforming to a requirement of our internal law." Indeed, this interpretation is now clearly erroneous. The decision of the Board in the instant case which reverts to the "Merry Cow" doctrine by overruling In re Certain Incomplete Trademark Applications, *supra,* is therefore in error.

Article 4 of the Convention, upon which defendant also relies, relates only to the right of priority for applications based on a previously filed foreign application. There is nothing in Article 4 concerned with the requirements necessary for registration.

■ As noted above the Convention refers to the domestic law for the conditions of registration. Registration of a trademark in the United States is governed by the Trade Mark Act of 1946, 15 U.S.C. § 1051 et seq. The specific purpose of the Act is to

". . . provide for the registration and protection of trade-marks used in commerce, to carry out the provisions of certain international conventions, and for other purposes."

It was not the intention of Congress to enact legislation which would grant rights in a trademark, rather the intention was to provide a mechanism to protect rights which had been obtained by an applicant prior to registration. The case of Turner v. HMH Publishing Co., 380 F.2d 224, 228 (5th Cir. 1967) is clear on this point.

> "Under the Lanham Act (15 U.S.C. § 1051 et seq.) registration of a trademark confers only procedural advantages and does not enlarge the registrant's rights, for ownership of the trademark rests on adoption and use, not on registration."

■ Therefore, as a collateral principle, the fact that an application has been filed confers no substantive rights on the applicant. The application date is important *procedurally* in the case of an *inter partes* proceeding since the party with the latest filing date becomes the junior party and bears the burden of proving that its right to the mark arose prior to the time claimed by the first applicant. See Jim Dandy Co. v. Martha White Foods Inc., 458 F.2d 1397 (CCPA 1972).

■ The question then is how one obtains rights in a trademark in the United States. The essence of a trademark has always been its use to uniquely identify particular goods and services. Exclusive use of such a mark is a valuable commercial right which is protected both by the common law and by the Lanham Act. In the United States, in contrast with some countries, the exclusive right to use a particular mark may arise only from its use in connection with the goods which the manufacturer wishes to distinguish. United States v. Steffans (The Trademark Cases), 100 U.S. 82, 25 L.Ed. 550 (1879) contains the definitive statement that rights in a trademark arise from its use.

■ The Trade Mark Act of 1946 did not change the basic concept of the derivation of trademark rights as developed by the common law. Section 44 upon which defendant bases its claim for priority was drafted for the narrow purpose of conforming to international agreements such as the Paris Union Treaty only "to the extent necessary to give effect to any provision of such convention . . ." As shown above, the Convention is not a repository of substantive rights. Further, Section 1 of the Act, to which § 44 refers, sets forth the provisions under which "the owner of a trademark used in commerce may register his trade-mark . . ." The dominant principle which emerges from § 1 is that the mark must be in use, for the applicant must state

> ". . . the date of applicant's first use of the mark in commerce, the goods in connection with which the mark is used and the mode or manner in which the mark is used in connection with such goods . . ."

■ It is important to note that the Act was designed to protect marks used "in commerce," which is defined in § 45 to mean "all commerce which may lawfully be regulated by Congress." This makes it clear that the Act has no extraterritorial application since the benefits allowed to either United States citizens or foreign nationals are completely internal to the United States. The Congress did not confer benefits for trademark rights existing outside the United States. See Sterling Drug Inc. v. Kroll A.-G. Chemische Fabriken, 159 U.S.P.Q. 628 (1968). Use of a trademark outside the United States does not establish or create rights which can be asserted in an *inter partes* proceeding. Cooper's Inc. v. Jockey Shoe Polish Inc., 149 U.S.P.Q. 704 (1966).

■ Therefore in the instant case prior right in a trademark in the United States depends on priority of use in the United States and is not affected by priority of use in a foreign country. Sterling Drug Inc. v. Kroll A.-G. Chemische Fabriken, *supra*. The priority which was contemplated by § 44(d) and by the Convention was a procedural priority only. It established a method by which a foreign applicant could obtain a priority filing date without having used his mark in commerce. To hold that

**968**

such priority grants a substantive right in the trademark itself when such mark has never been used in the United States is error. To allow a substantive priority to a foreign applicant would be to grant to him greater rights than those available to United States citizens. This is contrary to the Paris Union Treaty and to the Lanham Act.

 Further, the undisputed facts in the instant case show that defendant presented no testimony before the Board below and therefore is restricted to its filing date in the United States, September 19, 1969, as the *earliest* possible date for showing use in this *inter partes* proceeding. Aircraft Radio Corp. v. ARC Sound Ltd., 58 C.C.P.A. 1127, 440 F.2d 436 (CCPA 1971); Sterling Drug Inc. v. Sankyo Co. Ltd., 139 U.S.P.Q. 395 (1963). It has also been demonstrated that plaintiff's use in commerce is prior to September 19, 1969.

Therefore, pursuant to § 2(d) of the Act which prohibits the registration of a mark previously used in the United States by another, it is clear that defendant is not entitled to a registration of the mark LEMON TREE. The decision of the Trademark Trial and Appeal Board is vacated and counsel for plaintiff will present an order in conformity with this opinion.