### In re COMPAGNIE GENERALE MARITIME.

#### No. 91–1102.

United States Court of Appeals, Federal Circuit.

April 29, 1993.

Rehearing Denied; Suggestion for Rehearing En Banc Declined June 7, 1993.

---

842

Marc E. Brown, Poms, Smith, Lande & Rose, Professional Corp., Los Angeles, CA, argued for appellant. With him on the brief was Brian W. Kasell.

Albin F. Drost, Deputy Sol., Office of the Solicitor, Arlington, VA, argued for appellee. With him on the brief was Fred E. McKelvey, Solicitor.

Before NIES, Chief Judge, FRIEDMAN, Senior Circuit Judge, and MICHEL, Circuit Judge.

MICHEL, Circuit Judge.

Compagnie Generale Maritime (CGM) appeals from the September 28, 1990 decision of the Trademark Trial and Appeal Board (Board), *In re Compagnie Generale Maritime*, Nos. 584,002, 647,509, 647,512 & 739,-620 (TTAB September 28, 1990) (*In re CGM*), refusing registration for the mark FRENCH LINE for all of the myriad goods and services applied for by CGM. Because we hold that the Board's subsidiary fact findings and resolutions of the questions of ultimate fact regarding geographic descriptiveness and deceptive misdescriptiveness are not clearly erroneous, we affirm.

## BACKGROUND

■ CGM, a French corporation, sought registrations, under section 44(e) of the Lanham Act (the "Act"), 15 U.S.C. § 1126(e) (1982),[1] of the mark FRENCH LINE in stylized design shown below:

---

1. The Act was amended in 1988. This case, however, is governed by the previous version because CGM filed its applications prior to the amendments.

*French Line*

for a wide variety of goods and services in a multitude of classes covered by several appli-

2. The Board provided a representative list of these goods, services, and classes. *See In re CGM,* slip op. at 2 n. 1.

3. In *Crocker National Bank v. Canadian Imperial Bank of Commerce,* 223 USPQ 909 (TTAB1984), the Board held that regarding an application based on foreign registration under 15 U.S.C. § 1126(e), applicant need not meet the otherwise applicable statutory requirements regarding prior use of the mark. *Crocker National Bank* was governing case law at the time of CGM's applications and still is today. At oral argument, Chief Judge Nies nevertheless requested the parties to submit supplemental briefs on the issue of whether CGM's applications should have been required to allege use.

This issue was not raised by any party, either before the Board or in briefing the appeal for argument before this court. The dissent, however, sees the issue as jurisdictional and therefore not subject to waiver. But we do not believe that this issue implicates Board jurisdiction.

The dissent relies on section 1 of the Act, implying that, under its terms, CGM's applications were void and therefore the Board would be precluded from exercising jurisdiction over the applications. Section 1, however, merely enumerates prerequisites for registration. It begins by saying that the owner of a mark "may *register* his trade-mark" and then lists how he must do so. 15 U.S.C. § 1051 (emphasis added). The list includes, among others, filing an application specifying various things, including use, paying fees, and following Patent and Trademark Office (PTO) rules. But nowhere does section 1 refer to the jurisdiction of the Board. Nowhere does it suggest that for want of any specification required for registration, the PTO may not examine the application. Rather, the clear inference is that for lack of such specifications or proof, the mark will not be *registered.* Thus, contrary to the dissent, there is no *statutory* bar to the Board's jurisdiction. Accordingly, where, as here, examination led to refusal to register, the applicant may appeal to the Board if it pays the prescribed fee, for it is dissatisfied with the examiner's decision. An adverse decision and payment of appeal fees are the only jurisdictional requirements for appeal to the Board. *Id.* § 1070.

Nor, contrary to the dissent's suggestion, does section 1 deal with allegations required in an application before it may be considered. Rather, formal deficiencies in the application merely may bar registration.

cations, which were consolidated by the Board of CGM's request.[2] The applications were based on French registrations and, in accordance with the statute as interpreted in Board precedent in effect at the time of application, no specimens or affidavits of actual use were required or were submitted therewith.[3] The Examining Attorney for the

In any event, under the controlling Board decision, CGM's application was not returnable because of an implied exemption from any use requirement under section 1. Such exemption necessarily arises from the statutory section on foreign registrations as construed by the Board in *Crocker National Bank,* a construction due great deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Contrary to the dissent's suggestion, the issue here is *not* analogous to that presented in *In re Dien,* 680 F.2d 151, 214 USPQ 10 (CCPA1982), *In re Bose,* 687 F.2d 432, 215 USPQ 1 (CCPA1982), and *Arctic Corner, Inc. v. United States,* 845 F.2d 999 (Fed.Cir.1988), the only case authority cited by the dissent as directly supporting its conclusion of no jurisdiction. In *In re Dien* and *In re Bose*—both reissue cases—it was not a faulty application that rendered the Board's decision merely advisory, but rather the nature of the procedure under which the examiner had reviewed the validity of appellant's patent. The procedure prescribed by the reissue regulation then in effect, 37 C.F.R. § 1.175(a)(4) (1977), could not result in reissue, but only in a "preview" of what a reissue examination might find. Therefore, the court held that the Board's decision did not affect any existing legal rights of the appellant, and therefore the CCPA had no "case or controversy" to decide. Here, on the other hand, CGM applied for a registration under the statute and the Board issued a decision affecting the legal rights of appellant—CGM—it upheld the examiner's refusal to register CGM's mark. *Arctic Corner* was a government contracts case and, therefore, does not apply to the PTO— the agency at issue in this case. Furthermore, this court lacked jurisdiction in *Arctic Corner* because several events, including a submission of costs by the surety in that case, had to have occurred before appellant could claim any damages. At the time of the appeal in that case, the surety had not yet submitted its final payment request and, therefore, the Armed Services Board of Contract Appeals' opinion regarding appellant's rights was merely advisory and did not constitute an appealable decision. Here, the Board's decision directly affected appellant-CGM's rights and, therefore, was *not* merely advisory and constituted an appealable decision.

The question of whether an application makes an allowable request for registration is analogous to two common situations in civil litigation. First, it is similar to the question, under Fed. R.Civ.P. 12(b)(6), of whether a complaint states a

Patent and Trademark Office (PTO) refused registration under section 2(e) of the Act, 15 U.S.C. § 1052(e), on the alternative grounds, as interpreted by the Board, that CGM's mark was either merely descriptive or primarily geographically descriptive.

Before the Board, the Trademark Examining Attorney relied only on the primarily geographically descriptiveness ground, arguing that the primary significance of the words "FRENCH LINE" is geographical and a goods/place association exists or can be presumed to exist between the mark and the goods and services covered by the application. CGM, however, contended that its mark, FRENCH LINE, is not primarily geographically descriptive because the words "bring to mind applicant's transatlantic luxury steamship passenger service and 'applicant's world famous fleet of trans[a]tlantic luxury ocean liners,' " *In re CGM*, slip op. at 6–7, even though CGM no longer owns or operates any luxury liners.

The Board recognized that in order to establish a *prima facie* case of primary geographic descriptiveness, the PTO "must establish that the public associates the goods with the place named in the mark," *id.* at 8 (citing *In re Jacques Bernier, Inc.*, 894 F.2d 389, 391, 13 USPQ2d 1725, 1726 (Fed.Cir. 1990); *In re Nantucket, Inc.*, 677 F.2d 95, 213 USPQ 889 (CCPA1982)), but need not show that the place is "well known" for the applied-for goods or services, *id.* (citing *In re Nantucket*, 677 F.2d at 101, 213 USPQ at 894–95 (Nies, J., concurring); *In re Jack's Hi–Grade Foods*, 226 USPQ 1028, 1030

(TTAB1985)). The Board found that because France is "a major manufacturing and commercial nation," *id.*, the applied-for goods and services would be associated with the country. The Board further found that the words "FRENCH LINE" are primarily geographic. Thus, the Board found that a potential purchaser of goods or services under the mark "FRENCH LINE" would believe that the products or services came from France, rendering CGM's mark primarily geographically descriptive if the goods and services actually come from France [4] or primarily geographically deceptively misdescriptive if the goods and services do not come from France.[5]

Furthermore, upon consideration of CGM's other contentions on appeal, the Board similarly affirmed refusal of registration. The Board concluded that CGM proffered no evidence to support its contention that "purchasers may associate the mark with applicant's former luxury passenger service rather than with the geographic source," *id.* at 9—CGM had provided no evidence with its application of any actual use or any public reaction thereto. The Board also determined that the mark was not registrable even with CGM's disclaimer as to the words "French" and "Line" apart from the stylized mark because the stylization was minimal. Finally, the Board noted that, although CGM had submitted evidence that arguably might support a claim of distinctiveness, (1) the evidence did not "pertain to the specific goods and services covered by the[ ] applications," and (2) CGM did not request registration

---

claim upon which relief can be granted. And whether a complaint does so has been held to be a question on the merits and not on jurisdiction. *Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1945). Second, it is comparable to the situations, governed by Fed.R.Civ.P. 10(a) and (b), where a pleading omits certain information or contains a defect in form, neither of which goes to the jurisdiction of the court. *See* 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1321, at 726–27 (2d ed. 1990) (omission or defect in caption, in contravention of Fed.R.Civ.P. 10(a), is not determinative of the court's jurisdiction); 2A James W. Moore, Jo D. Lucas & George J. Grotheer, Jr., Moore's Federal Practice ¶ 10.03, at 10–16 to 10–17 (2d ed. 1992) ("Failure to separately state separate claims [per Fed.R.Civ.P.

10(b) ] does not affect the jurisdiction of the court.").

Therefore, because this issue neither is jurisdictional, nor was raised before the Board (or even here by the parties except upon request), we cannot properly reach the issue. Normal rules of waiver preclude our doing so. Further explanation of why the issue cannot be reached is contained in Judge Friedman's concurrence.

4. The Trademark Examining Attorney argued that all the goods and services should be deemed to come from France because CGM is a French corporation responsible for "the nature and quality of the goods produced by [its] licensees" in the United States. *In re CGM*, slip op. at 9.

5. CGM represents that its goods do not come from France.

under 15 U.S.C. § 1052(f), which provides an exception, when a mark "has become distinctive of the applicant's goods in commerce," to an otherwise proper refusal of registration under, *inter alia,* section 1052(e). *In re CGM,* slip op. at 6 n. 3. The Board did suggest that, in the future, CGM could possibly obtain registration of its mark by filing new applications showing that the mark has become distinctive for the applied-for goods and services. Based on all of these findings, the Board affirmed the refusal of registration for CGM's mark.

## ANALYSIS

▮ We review the Board's findings under the deferential clearly erroneous standard. Whether a mark is primarily geographically descriptive or deceptively misdescriptive is a question of fact. *See In re Loew's Theaters, Inc.,* 769 F.2d 764, 226 USPQ 865 (Fed.Cir.1985); *cf. Towers v. Advent Software, Inc.,* 913 F.2d 942, 944, 16 USPQ2d 1039, 1040 (Fed.Cir.1990) ("Whether a mark is descriptive is a question of fact."). Likewise, "the issue of acquired distinctiveness is a question of fact." *In re Loew's,* 769 F.2d at 769, 226 USPQ at 869. While we might perhaps have reached a different outcome with respect to some of the goods or services in question had we conducted *de novo* review, we cannot say that CGM has shown that the Board was clearly erroneous in its findings here.

For example, with regard to clothing, the Board took into account evidence presented by the Trademark Examining Attorney in the form of newspaper clippings discussing, *inter alia,* party dresses from France, children's fashions from France, and French designer clothes, respectively, as "French line[s]." Moreover, the Board noted that the mark, "THE AMERICAN LINE," for clothing was registered on the Supplemental Register. In addition, one clipping referred to a certain brand of cosmetics from France as a "French line of cosmetics." On such bases, the Board found that the mark is primarily

geographical. No clear error is seen in this determination.

We likewise hold that the Board did not clearly err in finding that "France, a major manufacturing and commercial nation, would be perceived as the source of the numerous goods and services listed in the applications if the mark is primarily geographical." *In re CGM,* slip op. at 8. Certainly, all of the goods and services would either originate in France or should be considered as if they did because they are sold by a French company. The Board's associational finding is not clearly erroneous.[6]

Because CGM provided no specimens of actual use of its mark or evidence on what associations purchasers made with respect to the mark, we hold that the Board did not clearly err in finding that CGM did not carry its burden of proof that its mark had become distinctive for any of the applied-for goods and services. In any event, CGM never sought registration based on distinctiveness.

In short, the Board's decision rests entirely on findings or determinations of fact, none of which have been shown to be clearly erroneous. Therefore, the decision of the Board upholding the refusal of registration is

AFFIRMED.

FRIEDMAN, Senior Circuit Judge, concurring.

I join Judge Michel's opinion for the court. I write separately to explain why I believe the court correctly declines (footnote 3) to reach the issue on which the dissent would decide the case, namely, whether an applicant for trademark registration in the United States based upon foreign registration of the mark is required to show prior use of the mark for the goods for which registration is sought. The court should not reach out to decide an issue that the litigants did not raise before the Board, that the Board did not decide, and that the appellant did not argue to us.

1. The only issue before the Board was whether the mark "French Line" was unreg-

---

**6.** The Board did not make separate findings for each and every item for which CGM applied, but rather treated all of the items *en bloc*. The dissent has not shown that the Board was required to treat them separately.

istrable because it was "primarily geographically descriptive." The sole basis upon which the Board affirmed the Trademark Examining Attorney's refusal to register the mark was that "if applicant's goods in fact come from France, we believe applicant's mark is primarily geographically descriptive of the source of those goods and services, and that if those goods and services do not come from France, then the mark would be primarily geographically deceptively misdescriptive."

In their initial briefs before this court, the parties similarly argued only whether the mark was primarily geographically descriptive. That was the only issue presented at oral argument, until the court asked whether the application was defective because it did not assert prior use of the mark. In response to the court's request, after argument each party filed a supplemental brief addressing that issue. The appellant argued briefly that such use was not required. The Commissioner's brief presented argument on both sides of the question, but took no position on it. These supplemental filings cannot properly be viewed as an injection by the parties of the issue into the case.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Securities & Exchange Comm'n v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). A reviewing court cannot affirm an agency on a ground other than that the agency gave. *Id.* at 95, 63 S.Ct. at 462 ("an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained"). The same reasoning should also dictate that a reviewing court should not refuse to uphold the result an agency reached, on the ground that the agency's prior decision, upon which the decision under review rests, was itself erroneous.

I recognize that under the practice of the Patent and Trademark Office, there is little likelihood that the validity of the Board's position that prior use need not be shown to obtain United States registration of a trademark based upon a foreign registration, would be directly presented to this court.

That consideration, however, does not justify the court in reaching out to decide an issue not raised before it. Although an appellate court always may notice plain error, even though not raised before it, the Board's error that the dissent discerns in this case is not of that kind.

In these circumstances, any change in the Board's position should be made by Congress. Congress apparently has done that in the Trademark Law Revision Act of 1988, discussed briefly below.

The dissent's position is in stark contrast with what the court did in the *Crocker* case. There, an augmented eight-member Board panel first decided that prior use need not be asserted when United States registration was sought based on a foreign registration. A regular three-member Board panel then refused registration because there was a likelihood of confusion between the two marks involved. On appeal, the only issue the parties raised was likelihood of confusion, and this court affirmed the Board on that issue without consideration of the augmented panel's ruling, made at an earlier stage of the same case, on the use issue. *Canadian Imperial Bank of Commerce v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir.1987). I do not understand why, if the court in that case limited its decision to the issue the parties presented to it, it should not follow the same course here. If, as the dissent now argues, the *Crocker* prior use ruling was erroneous, one would think that the court contemporaneously reviewing the second *Crocker* decision would have corrected that error.

A further consideration against deciding the prior use issue in this case is that for the future the issue is likely to have limited, if any, significance. Under the Trademark Law Revision Act, Pub.L. No. 100–667, Title I, § 133(4), 102 Stat. 3935, 3946 (1988), an applicant seeking registration based on a foreign registration must show that it "has a bona fide intention to use the mark in commerce." 15 U.S.C. § 1126(d)(2) (1988). I doubt that, in the face of this change in the statute, the Board will continue to apply the *Crocker* rule.

2. The dissent argues, however, that the Board had no jurisdiction to consider the application because the application's failure to allege prior use of the mark rendered the application invalid, that a court always may—indeed, must—consider the jurisdiction of the tribunal the decision of which it reviews, and that the Board's lack of jurisdiction deprives us of jurisdiction to decide the merits, I cannot conclude, however, that the Board lacked jurisdiction in this case.

The question the dissent addresses is one of statutory interpretation: Whether the Lanham Act requires an application for trademark registration in the United States based upon foreign registration of the mark to show prior use of the mark. The dissent's conclusion that the Act requires that showing does not establish that without that showing the Board had no "jurisdiction" in the case. "The term 'jurisdiction' ... is a verbal coat of ... many colors." *International Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 402, 106 S.Ct. 1904, 1918, 90 L.Ed.2d 389 (1986) (Rehnquist, J.) (quoting *United States v. Tucker Truck Lines, Inc.*, 344 U.S. 33, 39, 73 S.Ct. 67, 70, 97 L.Ed. 54 (1952) (Frankfurter, J., dissenting)). The dissent's conclusion that the applicant may not have met the statutory requirements for registration, so that the Board could not grant the application, does not mean that the Board had no jurisdiction in the case.

NIES, Chief Judge, dissenting.

The panel is divided on what issue in this appeal is dispositive. The majority upholds the merits of the Board's decision.[1] I would hold (1) that the PTO acted *ultra vires* in accepting and processing as applications the subject submissions which do not comply

with the statutory requirements for an application and (2) that by ruling on the merits, this court is rendering merely an advisory opinion. *In re Bose*, 687 F.2d 432, 215 USPQ 1 (CCPA1982); *In re Dien*, 680 F.2d 151, 214 USPQ 10 (CCPA1982). An affirmance of the PTO's refusal to register the alleged marks on the Principal Register for descriptiveness or deceptive misdescriptiveness under 15 U.S.C. § 1052 (section 2(e)) does not put an end to these applications. By a simple amendment to the Supplemental Register, the rejection for descriptiveness or misdescriptiveness is avoided (see 15 U.S.C. § 1091(a)) and the registrations will issue.[2] In any event, I disagree with the majority's choice of the ground for decision. The validity and completeness of the submissions as applications is a jurisdictional predicate to any decision on the merits by the PTO and *a fortiori* to our own review thereof, and must be resolved first. *In re Certain Incomplete Trademark Applications*, 137 USPQ 69, 77–78 (Dec.Comm'r Pat.1963). *Ex parte British Insulated Callendar's Cable Ltd.*, 83 USPQ 319, 320 (Dec.Comm'r Pat.1949). *See also Killip v. Office of Personnel Management*, 991 F.2d 1564 (Fed.Cir.1993); *Arctic Corner, Inc. v. United States*, 845 F.2d 999, 1000–01 (Fed.Cir.1988) (no jurisdiction in this court absent submission and denial of contractor's claim; opinion would be advisory); *In re Bose, supra; In re Dien, supra.* Unless all statutory requirements are met, the submissions are not entitled to a filing date. Without a filing date, there is nothing to examine. *Incomplete Trademark Applications*, 137 USPQ at 77–79.

The majority's ruling that the question of whether an agency acted within its powers

---

1. For some of the numerous items for which registration was sought, such as clothing and alcoholic beverages, a finding that FRENCH LINE is descriptive or misdescriptive appears reasonable. For other items, such as insurance agency, brokerage and actuarial services, the Board's decision appears at best highly speculative. The Commissioner now takes the position that the appeal should be dismissed because it does not present a ripe case or controversy for decision by an Article III court. The Commissioner's new position is based upon the argument that whether the mark is merely descriptive or deceptively misdescriptive depends upon how the

mark is used and, thus, until the mark is used the case is not ripe for consideration.

2. Contrary to the majority, the question of whether a submission is entitled to a filing date as an application is in no way analogous to pleadings of a complaint. (note 5) An agency is but a creature of statute. Any and all authority pursuant to which an agency may act ultimately must be grounded in an express grant from Congress. *Killip v. Office of Personnel Management*, 991 F.2d 1569 (Fed.Cir.1993). If an agency engages in acts beyond its authority, such act is *ultra vires* and void. *See id.*

cannot be decided because of the proscription of *Securities & Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943) is contrary to our precedent. *See, e.g., Killip v. OPM, supra.* In *Chenery*, the Supreme Court stated, "The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Chenery* precludes upholding an administrative decision on the merits on grounds upon which the agency did not rely. However, *before* looking to the merits of an agency decision, a reviewing court must determine that the agency acted within its powers or *ultra vires*. A dismissal for lack of statutory authority to make the decision is not an "affirmance on other grounds" of the agency action. *Chenery* presumes that the agency acted within its powers. "[A]n administra-

tive order cannot be upheld unless the grounds upon which the agency acted in exercising its *powers* were those upon which its action can be sustained." *Chenery*, 318 U.S. at 95, 63 S.Ct. at 462 (emphasis added).

Thus, I address the issue of the statutory requirements for an application which must be satisfied to bring a case or controversy respecting the merits before us. "A court may and should raise the question of its jurisdiction *sua sponte* at any time it appears in doubt." *Arctic Corner*, 845 F.2d at 1000.

## I

### Background

Compagnie Generale Maritime, a French corporation, (CGM), sought to register FRENCH LINE as a mark for an extensive list of goods and services [3] solely on the basis

3. Serial No. 584,002, filed July 26, 1985, for luggage, umbrellas and canes in Class 18; and coats, sweaters, vests, raincoats, pants, shirts, tops, blouses and other items of clothing in Class 25.

Serial No. 647,509, filed February 27, 1987, for various paper goods and printed matter, artists, drawing, and paint brushes, typewriters, daters, staplers, hole punches for paper, spine-binding equipment for spine-bound reports, playing cards, printer block, fonts and type in Class 16; home furniture, picture frame moldings, sales and display counters, room dividers and mirrors, etc., in Class 20; various sporting goods and equipment for playing various games, toys and Christmas tree artificial decorations and ornaments in Class 28.

Serial No. 647,512, filed February 27, 1987, for chemicals, resins, plastic materials, adhesives and other goods in Class 1; paints, varnishes, dyes, metals and other goods in Class 2; industrial oils and greases, degreasers, lighter fluid, fuels and gasoline, candles, and other goods in Class 4; animal vaccinations, medicines, medicated feeds and lotions, deodorants, diet supplements and foods, dental materials and other goods in Class 5; various common metals, train rails, metal cables, locks, pipes, safes, horseshoes, nails and screws, and other goods in Class 6; pumps, machines and machine tools, mowers, plows, combines and spreaders, washing machines and other goods in Class 7; navigational devices, audio and video equipment, microscopes and telescopes, scales, cash registers and calculating machines, fire extinguishers and other goods in Class 9; various medical instruments and equipment in Class 10; electric lamps, furnaces, boilers, kitchen ranges and ovens, frying pans, air conditioners, fans, sprinklers and other goods in Class 11; various vehicles in Class 12;

ammunition, explosives, fireworks, dynamite and other goods in Class 13; various musical instruments in Class 15; packing and insulating materials for aircraft, homes and buildings, pipes and storage tanks, hoses, panels for countertops, cabinets, and other goods in Class 17; stones, cement and construction material, cement pipes, portable homes, and other goods in Class 19; ropes, awnings, tarpaulins, sails, general utility bags, padding and other goods in Class 22; yarn and thread and other goods in Class 23, various fasteners, emblems, clothes hangers, thimbles, wigs and other goods in Class 26; carpets, rugs, mats, tapestries and other goods in Class 27; meat, fish, poultry, preserved and dried fruits and vegetables and other food and dairy products in Class 29; coffee, tea, cocoa, sugar, and other food items in Class 30; fresh fruits and vegetables, flowers, and various foodstuffs and other goods in Class 31; beer, ale, various waters, syrups and concentrates and other goods, in Class 32; various alcoholic beverages in Class 33; consulting, advertising agency and various business services in Class 35; insurance agency, brokerage, actuarial, estate planning, leasing, mortgage, real estate rental banking and other services in Class 36; repair and maintenance of vehicles and machinery, construction and repair of roads, buildings and pipelines, real estate development, fabric cleaning and pressing, vehicle cleaning and other services in Class 37; telecommunications, transmission, radio broadcasting and other services in Class 38; dressmaking, fabric treatment, welding, engraving film and videotape editing, laminating plating and other services in Class 40; theater services, film and videotape rental, conducting skating and gymnastic exhibitions, television news and entertainment production, various educational services in music gymnastics, ballet, etc., and other services

of its registrations in France. The Examiner refused registration on the ground that the mark sought to be registered was, in each instance, unregistrable on the Principal Register under 15 U.S.C. § 1052(e) of the Lanham Act, which precludes registration of merely descriptive or deceptively misdescriptive words. On appeal, the Board held that the primary significance of the phrase "FRENCH LINE" was geographic. Per the Board, consumers were likely to believe that the products or services came from France, if the goods or services were supplied from France; and if not originating there, the phrase would be primarily geographically deceptively misdescriptive. Under either circumstance, registration was, per the Board, precluded except upon proof of distinctiveness. 15 U.S.C. § 1052(f). CGM appealed to this court, arguing that the primary meaning of FRENCH LINE is not geographic and, thus, the holding of descriptiveness or deceptive misdescriptiveness was clearly erroneous.

At oral argument, because the record disclosed CGM's applications contained no allegations that the asserted mark had, in fact, been used anywhere for any goods or services and that no specimen labels evidencing use (and possibly the country of origin) had been filed, applicant's counsel was asked whether CGM's submissions complied with the statutory requirements for an application as specified in Section 1 of the Lanham Act. 15 U.S.C. § 1051.

Citing as authority *Crocker Nat'l Bank v. Canadian Imperial Bank of Commerce*, 223 USPQ 909 (TTAB1984), counsel responded that, as a French national, his client was entitled by treaty to register its alleged mark under 15 U.S.C. § 1126(e) of the Lanham Act (Section 44(e)), even if never used anywhere

on the more than 200 items set out in the applications, by virtue of its current registrations in France. Additional briefing on this issue was requested and received.[4]

## II

The jurisdictional issue raised by this appeal requires judicial interpretation of the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, respecting the requirements of an application which must be met by a foreign applicant who seeks a U.S. registration based on a foreign registration (hereinafter "home" registration) which qualifies under a treaty to serve as the basis for an application for registration in the United States. This appeal, deals with the provisions of Section 44 of the Lanham Act (15 U.S.C. § 1126) which gave effect to the obligations of the United States under treaties and conventions, prior to the amendments enacted in 1988.[5] However, the issues discussed herein are not mooted by the recent changes in the statute inasmuch as the question turns on whether Congress may, in accordance with treaty obligations, impose restrictions on a Section 44 applicant beyond those enumerated in the Convention of Paris for the Protection of Industrial Property of 20th March 1883 ("Paris Convention") of which the United States is a member. The current law imposes such a restriction not recognized in Section 44, albeit a different restriction. The specific question here is whether, under the Lanham Act provisions in effect in 1985 and the Paris Convention, a foreign applicant was entitled to obtain a U.S. trademark registration, pursuant to Section 44 of the Lanham Act, on the basis of a "home" registration for an asserted "mark" which the applicant had not used and was not using anywhere as a

in Class 41; adoption placement, engineering, drafting, computer consulting, health care, geologic survey and research, medical laboratory, printing, text editing, technical writing and other services in Class 42.

Serial No. 739,620, filed July 26, 1985, for stainless steel knives, forks and spoons in Class 8; costume jewelry, clocks, watches and parts therefor in Class 14; various fabrics for the manufacture of clothing, upholstery, vehicle interiors, curtains, sails, pennants, for the construction industry, tablecloths, napkins, bedspreads, bed sheets and pillows in Class 24; and raw and

manufactured smoking tobacco and matches in Class 34.

4. I wish to acknowledge with appreciation the Solicitor's brief which reviewed all pertinent authorities and fairly presented both sides of the issue.

5. By these amendments, applications may be filed based on a bona fide intention to use a trademark in United States commerce. 15 U.S.C. § 1091(b) (1988). CGM's intent to use is not involved in this appeal.

trademark or service mark for the goods or services specified in the application. Alternatively stated, did the statutory requirements for a trademark application, particularly the requirement of use of the asserted mark prior to filing, then set forth in Section 1 of the Lanham Act (15 U.S.C. § 1051), apply to foreign applicants? I conclude, as a matter of interpretation, that the statute did not exempt foreign applicants from any requirement for an application except for the requirement of an allegation of use *in commerce* of the United States for which it could substitute a qualifying "home" registration, and that this interpretation accords with the provisions of the Paris Convention.

### III

The imposition of use requirements on a foreign applicant claiming the benefits of Section 44 has had a tortured history.[6] Since 1887, the United States has adhered to the "Paris Convention." As explained by Professor McCarthy:

> The Paris Convention is essentially a compact between the various member countries to accord in their own countries to citizens of the other contracting parties' trademark and other rights comparable to those accorded their own citizens by their domestic law. The underlying principle is that foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens ["national treatment"]. The Convention is not premised upon the idea that the trademark laws of each member nation shall be given extraterritorial

application, but on exactly the converse principle that each nation's law shall have only territorial application.

1 McCarthy, *Trademarks and Unfair Competition*, § 19:24, at 927 (2d ed. 1984). Thus, common law and civil law countries with very different trademark laws were all able to join the Convention without changes in basic principles of national law. *See generally,* Stephen Ladas, *Patents Trademarks and Related Rights, National and International Protection,* §§ 22–28 & 564–631 (hereinafter *Ladas* ). National laws, thus, continued to determine whether rights arose from use— the common law principle or from registration—the civil law principle. *See Ladas,* at pp. 1226–1229.[7]

Provisions have been included in trademark statutes since the Act of March 3, 1897 to accommodate the treaty. Under the Trademark Act of 1905, applicants who were entitled to file for registration based on a "home" registration, nevertheless, were required to specify in the application a date of first use somewhere (not necessarily in U.S. commerce) and to provide specimens evidencing the mark was in use. Pub.L. No. 58–59, § 2, 33 Stat. 724, 725. The Trademark Act of 1946 (Lanham Act) carried forward enablement of the Convention and other treaties in Section 44. The initial regulations respecting requirements of an application, promulgated by the Patent Office under the Lanham Act (hereinafter "Trademark Rules"), specifically continued to impose the same requirements of information concerning use of the mark, as well as evidence of use, as under the 1905 Act.[8] In 1947, a Commis-

---

6. See John B. Pegram, *Trademark Law Revisions: Section 44,* 78 Trademark Rep. 141, 162–170 (1988), for an in depth review of this history.

7. The instructions to the United States delegation were specifically to the effect that "the internal regulation of [industrial property rights] by the legislation of this country is so much a matter for domestic consideration and control, especially with reference to the question of trade marks and their Federal protection under existing treaties, that this Department cannot agree to submit such questions to the proposed congress ... without the reservation that the conclusions of the conference on the subject must be considered as absolutely subordinate to such legislative provisions as may hereafter be made by this country." *Foreign Relations of the United States,* at

pp. 378–79 (1880). While some changes were subsequently agreed to, the idea that, in 1887, the United States agreed to the most fundamental change in its trademark principles by a treaty is, on its face, divorced from the reality of that era.

8. At a symposium sponsored by the Practicing Law Institute on December 18, 1947, the late P.J. Federico, one of the principal advisors to the U.S. Delegation to the Lisbon Convention (which resulted in a revised text of the Paris Convention) and a member of the Patent and Trademark Office Board of Appeals, spoke on drawing up the Trademark Rules for the new statute, particularly Section 44, as follows:

> You will note in this particular rule that we will require of foreign applicants the allegation

sioner of Patents decision reviewed and upheld the validity of the Trademark Rules as in accordance with the Convention. The purported application was not accepted for examination, even though based on a British registration, where specimens of actual use could not be supplied because the mark had not been used anywhere. On its face, the purported application was incomplete and void. *Ex parte British Insulated Callender's Cable Ltd.,* 83 USPQ at 319 (Dec.Comm'r Pat.1949).

In 1955, another Commissioner of Patents decision, *Ex parte Societe Fromageries Bel,* 105 USPQ 392 (Dec.Comm'r Pat.1955) (the "Merry Cow" case), overruled the standing fifty year interpretation of treaty rights and held that a foreign applicant need not allege any use in its application because such previous requirement was contrary to the Convention.

In 1962, the Patent Office reverted back to the *British Insulated* interpretation by issuing Trademark Rules which required foreign applicants relying on a "home" registration, nevertheless, to submit labels evidencing actual use of the mark and supply dates of first use somewhere. *See* 27 Fed.Reg. 1044 (Oct. 12, 1962). In 1963, these Trademark Rules were upheld in *Incomplete Trademark Applications,* 137 USPQ at 77–78.

It must be noted at this point that the issue of incompleteness of an application which results in the refusal of a filing date is usually one petitionable to the Commissioner. *See Pony Int'l,* 1 USPQ2d at 1076, 1078–79; *see also, e.g., British Insulated,* 83 USPQ 319; *Merry Cow,* 105 USPQ 392; *Incomplete Trademark Applications,* 137 USPQ 69. The TTAB has jurisdiction over an ex parte case only after an application has been accepted as meeting the statutory formalities and the mark has been refused registration during examination. It has no jurisdiction to review a Commissioner's decision. Although rare, an issue of an invalid application may also arise in inter partes proceedings where an adversary raises the issue. Thus, the TTAB infrequently has a case before it which raises an issue of the completeness of an application. In 1973, however, this occurred in *John LeCroy & Son, Inc. v. Langis Foods, Ltd.,* 177 USPQ 717 (TTAB1973) (the "Lemon Tree" case). However, it must be pointed out that where the issue is raised before the Board, the Commissioner takes the position that the Board must follow his interpretation of the law.[9]

In the *Lemon Tree* case, an application by a Canadian national was examined and approved for registration. In the opposition, the opposer asserted that the application was defective for failure of the applicant to have used the purported mark at the time required. The PTO attempted to resurrect the *Merry Cow* "no-use required" interpretation based on treaty rights, but that decision was reversed on appeal to the district court. 376 F.Supp. 962, 182 USPQ 132 (D.D.C.1974). On further appeal, the Circuit Court determined that the foreign applicant *had* used its mark and that the issue of registering an unused "mark" was not in the case. *SCM Corp. v. Langis Foods, Ltd.,* 539 F.2d 196, 202–03 n. 12, 190 USPQ 288, 293–94 n. 12 (D.C.Cir.1976). Thus, the refusal to accept Section 44 applications without compliance with Section 1 remained the practice.

The saga continued with the Commissioner's 1977 proposed rule change eliminating a use requirement for foreign applicants, 42 Fed.Reg. 40,450 (Aug. 10, 1977), which proposal was withdrawn a year later after much criticism. 973 Official Gaz.Pat. and Trade-

---

that the trade-mark is in use, not that it is in use in commerce, and the requirement for labels.

Not all member countries adhere to the Lisbon text. In that circumstance, the Lisbon text does not replace the text actually signed by member countries.

9. *See* Correspondence Between Board Members and PTO Commissioner on Board Independence, 44 Pat. Trademark & Copyright J. (BNA) 43, 44–

45 (May 14, 1992). The Commissioner maintains his control by virtue of his authority to appoint members of the Board to decide a case. The propriety of the Commissioner's selecting members of a panel to render a decision he believes is correct is currently under review in this court. *See* Appeal No. 92–1381, *Ex parte Alappat,* and order of this court therein dated December 3, 1992, 980 F.2d 1439. *See also Ex parte Alappat,* 23 USPQ2d 1340, 1340 (Bd.Pat. App. & Int.1992).

mark Off. 19 (Trademarks) (Aug. 1, 1978). *See* Pegram, *supra* note 4, at 169.

For six years the matter lay dormant, with the controlling authority being the *Incomplete Trademark Applications* decision (use required) and with the Trademark Rules requiring a foreign applicant to conform to all requirements of a regular application, including an allegation of actual use, albeit, actual use in *United States* commerce was not necessary for a Section 44 application.

In 1984, the Commissioner, acting through the Board in the *Crocker Bank* case,[10] adopted the position that a use requirement for a Section 44 applicant is inconsistent with the Paris Convention and that the Lanham Act had to be interpreted so as to eliminate the conflict. This was accomplished by ruling that Section 1 did not apply to Section 44 applications. The *Crocker Bank* ruling was the Commissioner's position at the time the subject applications of CGM were filed.[11]

## IV

The starting point for resolution of the issue presented is, of course, the statute. It is necessary to construe a number of sections of the Lanham Act, particularly sections 1, 44, and 45. These sections provided in pertinent parts at the relevant time:

*Sec. 1 (15 U.S.C. § 1051)* : **Registration; application; payment of fees; designation of resident for service of process and notice**

The owner of a trade-mark used in commerce may register his trade-mark under this chapter on the principal register established:

(a) By filing in the Patent and Trademark Office—

(1) a written application, in such form as may be prescribed by the Commissioner, verified by the applicant, or by a member of the firm or an officer of the corporation or association applying, specifying applicant's domicile and citizenship, *the date of applicant's first use of the mark, the date of applicant's first mark in commerce, the goods in connection with which the mark is used and the mode or manner in which the mark is used in connection with such goods,* and including a statement to the effect that the person making the verification believes himself, or the firm, corporation, or association in whose behalf he makes the verification, to be the owner of the mark sought to be registered, that the mark is in use in commerce, and that no other person, firm, corporation, or association, to the best of his knowledge and belief, has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when applied to the goods of such other person, to cause confusion, or to cause mistake, or to deceive....

(2) a drawing of the mark; and

(3) such number of *specimens* or facsimiles of the mark *as actually used* as may be required by the Commissioner.

(b) By paying into the Patent and Trademark Office the filing fee.

(c) *By complying with such rules or regulations,* not inconsistent with law, as may be prescribed by the Commissioner.

(d) *If the applicant is not domiciled in the United States* he shall designate by a written document filed in the Patent and Trademark Office the name and address of some person resident in the United States on whom may be served notices or process in proceedings affecting the mark....

\* \* \* \* \* \*

*See Canadian Imperial Bank of Commerce v. Wells Fargo Bank,* 811 F.2d 1490, 1 USPQ2d 1813 (Fed.Cir.1987) (affirming likelihood of confusion). The court panel, thus, had no reason to be aware of the jurisdictional issue and did not rule on it. The situation here is the same as in *In re Bose* and *In re Dien, see supra,* where the court had decided previous cases involving invalid applications without questioning jurisdiction.

---

**10.** *Crocker Bank* was decided by a specially constituted panel which included the later Deputy Assistant Commissioner of Trademarks. 223 USPQ at 909 n. 1. See note 9.

**11.** While the final decision in *Crocker Bank* was appealed to this court, the ruling on the use requirement had been made on a preliminary motion. That ruling was not mentioned in the Board's final decision, and was not appealed.

*Sec. 44 (15 U.S.C. § 1126) International Conventions (a)*: **Register of marks communicated by international bureaus**

The Commissioner shall keep a register of all marks communicated to him by the international bureaus....

*(b)*: **Benefits of section to persons whose country of origin is party to convention or treaty**

Any person whose country of origin is a party to any convention or treaty relating to trade-marks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.

*(c)*: **Prior registration in country of origin; country of origin defined**

No registration of a mark in the United States by a person described in subsection (b) of this section shall be granted until such mark has been registered in the country of origin of the applicant, unless the applicant *alleges use in commerce.*

For the purposes of this section, the country of origin of the applicant is the country in which he has a bona fide and effective industrial or commercial establishment, or if he has not such an establishment, the country in which he is domiciled, or if he has not a domicile in any of the countries described in subsection (b) of this section, the country of which he is a national.

*(d)*: **Right of priority**

*An application for registration of a mark under sections 1051, 1052, 1053, 1054 or 1091 of this title, filed by a person described in subsection (b)* of this section who has previously duly filed an application for registration of the same mark in one of the countries described in subsection (b) of this section shall be accorded the same force and effect as would be accorded to the same application if filed in the United States on the same date on which the application was first filed in such foreign country: Provided, That—

(1) the application in the United States is filed within six months from the date on which the application was first filed in the foreign country;

(2) *the application conforms as nearly as practicable to the requirements of this chapter, but use in commerce need not be alleged;*

(3) the rights acquired by third parties before the date of the filing of the first application in the foreing [sic] country shall in no way be affected by a registration obtained on an application filed under this subsection;

(4) nothing in this subsection shall entitle the owner of a registration granted under this section to sue for acts committed prior to the date on which his mark was registered in this country unless the registration is based on *use in commerce.*

\*　\*　\*　\*　\*　\*

*(e)*: **Registration on principal or supplemental register; copy of foreign registration**

A mark duly registered in the country of origin of the foreign applicant may be registered on the principal register if eligible, otherwise on the supplemental register in this chapter provided. The application therefor shall be accompanied by a certification or a certified copy of the registration in the country of origin of the applicant.

*Sec. 45 (15 U.S.C. § 1127)*: **Construction & definitions**

In the construction of this chapter, unless the contrary is plainly apparent from the context—

\*　\*　\*　\*　\*　\*

The word "commerce" means all commerce which may lawfully be regulated by Congress.

\*　\*　\*　\*　\*　\*

The term "trade-mark" includes any word, name, symbol, or device or any combination thereof *adopted and used by a manufacturer or merchant to identify his*

*goods* and distinguish them from those manufactured or sold by others.

The term "service mark" means a mark *used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others.* Titles, character names and other distinctive features of radio or television programs may be registered as service marks, notwithstanding that they, or the programs, may advertise the goods of the sponsor.

    \*      \*      \*     .     \*      \*      \*

The term "mark" includes any trademark, service mark, collective mark, or certification mark entitled to registration under this chapter whether registered or not.

(Emphasis added.) Although far from a model of clarity, read as a whole,[12] the statute contemplates that a foreign applicant seeking registration for a "mark" based on a "home" application or registration may file an application under Section 1 (15 U.S.C. § 1051), which is to be examined in accordance with the restrictions of the statute, particularly Section 2 (15 U.S.C. § 1052), except that *use in commerce* need not be alleged, provided the foreign applicant supplies a copy of its "home" registration.

Section 44, by its use of the term "mark" invokes the definitions of "trademark" and "service mark" in Section 45. As there defined, a registrable "trademark" within the meaning of the statute is "any word, name, symbol or device or any combination thereof adopted *and used by* a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others" (emphasis added). Similarly, the definition of a registrable service mark requires that it *must be used* to qualify for registration as a mark under the statute. No exemption from these definitions are afforded an applicant invoking Section 44. Thus, without *use,* as a trademark or service mark, of the word, name, symbol or device for which registration is sought, an applicant

does not meet the requirements of Section 44 for registration even though it bases its application on an otherwise qualifying "home" registration (Section 44(e)) or "home" application for registration (Section 44(d)). While Section 44 does provide an exemption from the Section 1 requirement for an allegation of "use in commerce," nothing can be found in Section 44 which similarly dispenses with the definitional requirement that to be a "mark," there must be *use* of what is claimed. Nor is there an exemption from the other requirements of Section 1 that an applicant must specify (1) its date of first use of the mark, (2) the goods in connection with which the mark is used and (3) the mode or manner in which the mark is used on the goods and comply with other rules and regulations pertaining to application not inconsistent with law.

It is not in any way surprising that "use in commerce" would be dispensed with for an applicant invoking Section 44 but not the requirement for use somewhere. The "use in commerce" requirement is the Constitutional basis for enactment of the Lanham Act, *i.e.,* under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. *See Trade–Mark Cases,* 100 U.S. 82, 25 L.Ed. 550 (1879). Accordingly, although a mark may be in intrastate use, use in commerce regulatable by Congress is essential to obtain a federal registration of a mark. *Id.* Thus, to permit the substitution of one jurisdictional basis, the treaty power, for another, the commerce clause, as the basis for registration under the federal statute is eminently logical.

The definitional requirement for use in order to be a "mark," on the other hand, stems from the common law concept that without trade, there can be no *trade* mark. *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916) (common law rights accrue by "use of the mark in trade"). A trademark used in commerce is, of course, "used" in the definitional sense so that any additional allegations

---

**12.** Section 44(a) has been virtually unused and is not involved here. The provisions of Section 44(d), which by its terms relates only to obtaining priority rights based on a home application, are uniformly interpreted as carrying over to

Section 44(e) so as to eliminate the requirement of an allegation of use in commerce in Section 44(e) as well. *See Crocker Bank,* 223 USPQ at 915–918.

respecting use, at first, may appear superfluous. Nevertheless, the drafters of the statute built the use requirement into the very definition of a mark and required disclosure of the date of *first* use (in commerce or otherwise). For one thing, this information facilitates the resolution of conflicts between claimants. Priority disputes over the same or similar marks generally turn on a comparison of dates of *first use* by the respective claimants, regardless of whether in interstate commerce or not, in accordance with common law principles. Such information is thus useful in the total registration scheme. *See, generally,* Edward C. Vandenburgh, *Trademark Law and Procedure,* §§ 10.11(c) and (d), at 293–298 (2d ed. 1968).

Because of the territorial nature of common law rights, use abroad generally has little or no effect respecting a claimant's priority vis-à-vis another. *See* Walter J. Derenberg, *Trade Mark Protection and Unfair Trading,* § 48, at 552–58 (1936) and cases cited therein. However, the right to register is purely a statutory right. The question thus is not what the common law provides but what the statute provides. What requirements did Congress impose to invoke the statutory right to registration? A straight forward reading of the statute inescapably leads to the conclusion that, prior to the 1988 amendments, no word, name, symbol or device was eligible for registration unless it had been used. Absent use, there was no "mark," as defined by Congress, which could be the subject of a U.S. application for registration. The Convention itself has no definition of mark.

The *Crocker Bank* decision reasons that use is not required because there is no specific language in Section 44 requiring use of a mark or specimens of use or a statement of mode of use. 223 USPQ at 915. As previously noted, however, Section 44 incorporates a definition of "mark" which requires "use." Thus, this basis for the no-use interpretation is fundamentally flawed.[13] Further support

was found in the language in Section 44(d) that an applicant invoking Section 44 need only "conform as nearly as *practicable* to the requirements of this Act." All requirements of use of the mark prior to filing must, therefore, be excused because it was not "practicable" where the foreign registration was obtained without a requirement that a mark be used.[14] *Id.* at 916–17. However, it should be noted that, as a matter of "practicability," this requirement had been imposed on foreign registrants for at least 75 years.

Wholly absent from the *Crocker Bank* ruling is any recognition of the Section 45 (15 U.S.C. § 1127) definition of the term "mark" as used in the statute. In contrast, the *Incomplete Trademark Applications* decision relied on the definition in Section 45 in determining that the *statute* required use before applying for registration. I conclude that the "practicable" clause cannot be given the sweeping effect stated in *Crocker Bank,* and that *Incomplete Trademark Applications* properly gave controlling significance to the definitional section. The "practicable" clause would be a strangely obscure way for Congress to dispense with the statutory Section 45 definition of what is a "mark" for all Section 44 applicants, and no authoritative support exists for such a construction.

The "Board"[15] also found it anomalous that the statute would impose a use requirement which, in view of the territorial principles of trademark law, cannot create common law trademark rights in the United States. It concluded that Congress would not have enacted a meaningless requirement under the common law. However, as indicated, the right to register and rights under the common law are distinctly different rights. Moreover, the Lanham Act contains many departures from the common law—incontestability for example. 15 U.S.C. § 1065. Also, the specific exclusion of foreign treaty applicants from the requirement of alleging "use in commerce" itself becomes meaningless if an allegation of use is not required at all.

---

13. *See* Pegram, *supra* note 6, at 172.

14. The Board (which had before it an application claiming priority under Section 44(d)) found it "impracticable" to require use of a foreign registered mark in view of the shortness of the six-

month priority period during which a U.S. application had to be filed. There is no time limit for filing otherwise.

15. That term is used advisedly. See n. 9.

Since Congress chose to limit the exemption to use "in commerce," the Commissioner, whether acting directly or through the Board, was not free to redraft the statute to one more to its liking.[16] Finally, the requirement of use of a foreign mark does not lead to an irrational or absurd result. It has the practical effect of limiting the amount of "deadwood" which has to be processed by the PTO and, once on the register, impedes decisions of domestic businesses.

In sum, I conclude that the *Crocker Bank* decision is in error because it treats Section 44 as independent from the rest of the statute. Section 44 does not stand alone.

## V

My conclusion that the statute imposed a use requirement on a foreign applicant despite its "home" registration does not end the inquiry. The statute must be read in harmony with treaty obligations, if possible. The scholarly writings on this subject are voluminous.[17] Fortunately, it is unnecessary to enter the debate over whether the Convention is self-executing[18] and over whether the statute or the Convention has higher status inasmuch as I conclude that the Paris Convention, in its original as well as in subsequent texts, does not conflict with the statutory interpretation that, at the time of the filing of the subject applications, a use requirement was imposed on a foreign applicant invoking Section 44.

The Paris Convention of 1883 was revised at Brussels (1900), Washington (1911), The Hague (1925), London (1934), Lisbon (1958) and Stockholm (1967). Throughout almost the entire history of the Convention, the United States has, without objection from other member states, required foreign applicants to allege that the mark sought to be registered has been used somewhere and to submit actual labels in connection with their U.S. applications as required under our statute for all other applicants. A fresh look at the Convention's provisions does not disclose a conflict between this interpretation of our statute and the treaty.

The Paris Convention has always provided that nationals of each member country shall enjoy "national treatment" only if "they observe the conditions and formalities imposed upon nationals." Article 2. As clarified by the Lisbon text, Article 6 contains the following more specific language:

> The conditions for the filing and registration of trademarks shall be determined in each country of the Union by its domestic law.

After full examination of the language and intent of the Convention in *Incomplete Trademark Applications*, 137 USPQ at 71–75, the requirement of use was held to be an acceptable requirement of our domestic law to impose on foreign applicants for registration. Inasmuch as the requirement for use

---

16. A no-use interpretation was necessary for the United States to adhere to the Trademark Registration Treaty (TRT), of which it was a principal sponsor. *See Crocker Bank*, 223 USPQ at 917 n. 32, extolling the advantages of applications without use voiced in connection with those negotiations. While the United States delegation from the PTO was very active in promoting TRT, the United States never became a party to TRT because of strong opposition from the private sector.

17. In addition to those more specifically cited, these include: John B. Pegram, *Section 44 Revision: After the 1988 Act*, 79 Trademark Rep. 220 (1989); Beat Messerli, *Registration of a Trademark Under Section 44 of the Lanham Act and the Requirement of Actual Use*, 77 Trademark Rep. 103 (1987); *The United States Trademark Association Trademark Review Commission Report and Recommendations to USTA President and Board of Directors*, 77 Trademark Rep. 375 (1987); Anthony L. Fletcher and Steven M. Weinberg, *The*

*Thirty–Eighth Year of Administration of the Lanham Trademark Act of 1946*, 75 Trademark Rep. 573, 660–63 (1985); Arthur Schwartz, *Minimum Use Requirements for Foreign Trademark Owners*, 68 Trademark Rep. 148, 153–55 (1978); Eric Offner, *International Trademark Protection*, at 30 et seq. (1965); Allan Zelnick, *Foreign Trademark Applicants and Registrants and the Requirement of Use: The Right to Register*, 52 Trademark Rep. 641 (1962); Stephen Ladas, *Protection of Foreign Trademarks Registered Under the Convention in the United States Patent Office as Against Claimants Under the Common Law*, 34 Trademark Bull. 305 (1939).

18. In an opinion dated April 5, 1889, the Attorney General of the United States stated, "[The Paris Convention] is, therefore, not self-executing but requires legislation to render it effective for the modification of existing laws." Off.Gen. of U.S. Patent Office (1889) XLV 11397. *See also Crocker Bank*, 223 USPQ at 917 n. 33.

of a "mark" before filing a U.S. application is imposed on U.S. nationals, it was held not to violate the Convention.

The *Crocker Bank* decision rejected the analysis of *Incomplete Trademark Applications* and adopted the view that a use requirement was a substantive ground of rejection incorporated from the common law, not a "condition" or formality of an application, and that a foreign registration could be rejected only on the grounds recognized *in the Convention itself.* Those grounds, per *Crocker Bank,* are only those found in Article 6 [6 quinquies of Lisbon text] [19] of the Convention which provides:

> Every trade mark duly registered in the country of origin shall be admitted for registration and protected in the form originally registered in other countries of the Union.
>
> Nevertheless, the following marks may be refused or cancelled:
>
> 1. Those which are of such a nature as to prejudice rights acquired by third parties in the country in which protection is applied for.
>
> 2. Those which have no distinctive character. . . .
>
> 3. Those which are contrary to morality or public order.

*Crocker Bank* held that this Article 6 language means that the United States is required to register any mark based upon a qualifying foreign registration unless it is likely to be confused with another mark, not distinctive, or scandalous or immoral, citing *Fromageries Bel,* 105 USPQ at 398. Other requirements therefore are impermissible under Article 6.

I disagree. Nothing in the treaty limits "conditions" for filing to nonsubstantive grounds. Further, if there is no "mark" within the concepts of a national law until used, one does not get to the question of whether a "mark" is being refused registration on grounds provided by the treaty. *Ladas,* at pp. 1228–1229. The limitations on the grounds permitted for refusal to register set out in Article 6 simply do not come into play.[20] Those restrictions apply only to a "mark," and national law was left to define what is a "mark."

The *Crocker Bank* interpretation of the Convention does not accord with the interpretation of other national members. For example, the trademark statutes of Canada, an adherent to the original Convention text since 1925, have included various requirements which do not fit into the above three grounds for rejection mentioned in Article 6. Canadian law at one time required use in Canada and was later changed to allow applications based on an intent to use *in Canada,* or use abroad and making the mark known in Canada, via promotional activities. *See* Eric Offner, *International Trademark Protection* §§ 30–31 (1965). None of these Canadian "conditions" would be permissible under the *Crocker Bank* interpretation of the Convention.

One need look no further than the authoritative guide published in 1968 by the international organization that then administered the Paris Convention, known as BIRPI, for a contrary treaty interpretation. As stated therein, "Member states are equally free regardless of Article 6 quinquies, to apply to trademark applications other provisions of their domestic law . . ., such as a requirement of previous use of the mark. . . ." *Guide to the Application of the Paris Convention for the Protection of Industrial Property,* at 111 (1968).

There is simply no creditable authority to the contrary. Indeed, if there were any doubt as to the compatibility of the Convention with national requirements respecting conditions which must be met for a valid application, Congress has ended any further debate by the 1988 amendments of Section 44. The present provision is in some respects a *more restrictive* provision than the pre–1988 averment. Section 44 now requires that every "application must state the applicant's bona fide intention to use the mark *in*

---

19. Article 6 "quinquies" refers to the Lisbon text to which the United States and France are parties.

20. While the Lisbon text also does not allow rejection because of the "form" of a mark, *e.g.,* composed of single letters or numbers, rather than words, a user requirement is not affected by this caveat.

[United States] *commerce*" (emphasis added). The Section 45 definitions of "mark," "trademark," and "service mark" have also been amended to include words or other trade symbols *intended* to be *used in commerce* as well as those which have been used. This is the meaning now to be given to "mark" whether in the statute or treaty.

Finally, the amendments to Section 1 clarify that Section 44 is not independent from the requirements of Section 1. Section 1 now specifically references Section 44 and excepts a Section 44 application only from the requirements therein that an intent to use application must be timely followed with evidence of actual use *in commerce* before a registration may issue. 15 U.S.C. § 1051(b)(1)(A) (1988). The imposition of a requirement of a declaration of an *intent to use in commerce* on all treaty applicants under Section 44 is directly contrary to the *Merry Cow/Crocker Bank* rationale that the Paris Convention limits the grounds for rejection to those set forth in the Convention. Congress does not agree with that broad interpretation of the effect of the treaty provisions. In view of the definitive position taken by Congress, the various provisions of the treaty need not be examined further. The *Merry Cow/Crocker Bank* interpretation must be overturned.

## VI

The Commissioner of Patents and Trademarks acted beyond his statutory authority in accepting the subject submissions as applications and forwarding them for examination. Because applicant has no application for a mark which meets the statutory requirements, applicant is not entitled to registrations either on the Principal or Supplemental Register.