THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
25 March 2009
AD

**UNITED STATES PATENT AND TRADEMARK OFFICE**
————————

**Trademark Trial and Appeal Board**
————————

In re Roy J. Mankovitz
————————

Serial No. 77000589
————————

John G. Posa of Gifford, Krass, Sprinkle, Anderson &
Citkowski, P.C. for Roy J. Mankovitz.

John M. Wilke, Trademark Examining Attorney, Law Office 104
(Chris Doninger, Managing Attorney).
————————

Before Quinn, Walters, and Drost, Administrative Trademark
Judges.

Opinion by Drost, Administrative Trademark Judge:

On September 15, 2006, Roy J. Mankovitz (applicant)

filed an intent-to-use application to register the mark THE

MONTECITO DIET, in standard character form, on the

Principal Register for goods and services ultimately

identified as:

> Printed publications, namely, books, magazines,
> newsletters, brochures, and pamphlets concerning
> health, nutrition, illness prevention, detoxification,
> diet and lifestyle choices in Class 16

> On-line journals, namely, blogs featuring information in the field of health, nutrition, illness prevention, detoxification, and diet and lifestyle choices in Class 41
>
> Providing health information; providing information in the field of nutritional counseling; providing information in the field of illness prevention, diet, detoxification, and lifestyle choices; providing global computer websites featuring information in the field of health, nutrition, illness prevention, detoxification, and diet and lifestyle choices in Class 44

The application also contains a disclaimer of the word "diet."[1]

The examining attorney has refused to register applicant's mark on the ground that the mark is primarily geographically descriptive under Section 2(e)(2) of the Trademark Act.  15 U.S.C. § 1052(e)(2).  When the examining attorney made the refusal to register final, applicant filed a notice of appeal.

In support of his refusal, the examining attorney submitted the following information from www.wikipedia.org for Montecito, California:

> **Montecito** is a census-designated place (CDP) in Santa Barbara County, California.  As of the 2000 census, the CDP population was approximately 10,000, although the boundaries are ill-defined.  Montecito is among the wealthiest communities in the United States and is home to many celebrities.  It is east of, and directly adjacent to the city of Santa Barbara, occupying the eastern portion of the coastal plain south of the

---

[1] Serial No. 77000589.

Santa Ynez Mountains. Portions of the town are built on the lower foothills of the range. Notable roads spanning the length of Montecito include Mountain Drive, Sycamore Canyon Road, and East Valley Road. It is one of the wealthiest areas in California.

**Geography**

Montecito is located at 34°26'1"N, 119°37'55"W (34.433687, -119.631845).

According to the United States Census Bureau, the CDP has a total area of 24.2 km$^2$ (9.3 mi$^2$), all land.

**Demographics**

As of the census of 2000, there were 10,000 people, 3,686 households, and 2,454 families residing in the CDP. The population density was 413.8/km² (1,072.3/mi²). There were 4,193 housing units at an average density of 173.5/km² (449.6/mi²). The racial makeup of the CDP was 94.03% White, 0.48% African American, 0.31% Native American, 1.29% Asian, 0.21% Pacific Islander, 2.14% from other races, and 1.54% from two or more races. Hispanic or Latino of any race were 5.19% of the population.

There were 3,686 households out of which 25.7% had children under the age of 18 living with them, 57.1% were married couples living together, 7.2% had a female householder with no husband present, and 33.4% were non-families. 27.0% of all households were made up of individuals and 14.0% had someone living alone who was 65 years of age or older. The average household size was 2.41 and the average family size was 2.85.

In the CDP the population was spread out with 18.4% under the age of 18, 13.5% from 18 to 24, 16.6% from 25 to 44, 30.0% from 45 to 64, and 21.5% who were 65 years of age or older. The median age was 46 years. For every 100 females there were 84.7 males. For every 100 females age 18 and over, there were 82.1 males.

The median income for a household in the CDP was $110,669, and the median income for a family was $130,123. Males had a median income of $81,719 versus $42,182 for females. The per capita income for the

CDP was $70,077. About 2.3% of families and 3.8% of the population were below the poverty line, including 2.6% of those under age 18 and 2.2% of those age 65 or over.

**Points of Interest**
- Lotusland
- Montecito is the home to many celebrities, including Oprah Winfrey, Steve Martin, Eva Marie Saint, Tab Hunter, John Cleese, Rob Lowe, Jimmy Connors, Avril Lavigne, Christopher Lloyd, Troy Aikman, Kevin Costner and billionaire businessman Ty Warner.
- Westmont College
- Montecito Journal – Local Newspaper
- Amusement Safety Organization, Inc. – national amusement safety & travel research organization
- The Music Academy of the West

We add that applicant, an individual, lists his address as "Montecito, California."

"In order for a mark to be considered primarily geographically descriptive under Section 2(e)(2), it must be shown that (1) the mark's primary significance is a generally known geographic location; and (2) that the relevant public would be likely to make a goods/place association, that is, would be likely to believe that the goods originate in the place named in the mark." *In re Spirits of New Merced LLC*, 85 USPQ2d 1614, 1616 (TTAB 2007). *See also In re Brouwerij Nacional Balashi NV*, 80 USPQ2d 1820, 1821 (TTAB 2006); *In re Handler Fenton Westerns, Inc.*, 214 USPQ 848, 849-50 (TTAB 1982); and TMEP § 1210.01(a) (5th ed. Sept. 2007) (Test for geographically descriptive marks: (1) the primary significance of the

mark is a generally known geographic location; (2) the goods or services originate in the place identified in the mark; and (3) purchasers would be likely to believe that the goods or services originate in the geographic place identified in the mark).

Furthermore, the Federal Circuit has quoted the board as correctly saying:

> [H]ere a refusal of registration is based on the finding that a mark if primarily geographically descriptive of the goods, that is, the goods actually come from the geographical place designated in the mark, the Examining Attorney must submit evidence to establish a public association of the goods with the place if, for example, there exists a genuine issue raised that the place named in the mark is so obscure or remote that purchasers would fail to recognize the term as indicating the geographical source of the goods.

*In re Societe Generale Des Eaux Minerales de Vittel S.A.*, 824 F.2d 957, 3 USPQ2d 1450, 1451 (Fed. Cir. 1987) (emphasis omitted).

We begin by noting that applicant's mark is not simply MONTECITO but rather THE MONTECITO DIET.  However, the additional word "diet" would not overcome the primarily geographically descriptive refusal because the subject matter of applicant's goods and services include, inter alia, diet-related information.  Therefore, the term "diet" would not be sufficient to establish a non-geographically descriptive meaning for the mark.  Highly descriptive or

generic wording does not convert a geographically descriptive term into a non-geographic term. *In re Compagnie Generale Maritime*, 993 F.2d 841, 26 USPQ2d 1652 (Fed. Cir. 1993) (FRENCH LINE (stylized) primarily geographically descriptive of goods and services from France); *In re Cambridge Digital Systems*, 1 USPQ2d 1659, 1662 (TTAB 1986) (CAMBRIDGE DIGITAL and design primarily geographically descriptive when applicant's place of business is Cambridge, Massachusetts); and *In re Carolina Apparel*, 48 USPQ2d 1542, 1543 (TTAB 1998) ("The addition of a generic term to a geographic term does not avoid the refusal of primary geographic descriptiveness").

Therefore, we now address whether the term "Montecito" is a generally known geographic location. The evidence shows that Montecito refers to an area near Santa Barbara, California, with approximately 10,000 inhabitants and it is the "home of many celebrities." There is no evidence that the term has any other meaning. We find that this minimal information does show that the term is a generally known geographic location. *Accord In re MCO Properties Inc*., 38 USPQ2d 1154, 1156 (TTAB 1995) ("The record shows that "FOUNTAIN HILLS" is the name of the town in Arizona where applicant is located and renders its services. The materials submitted by the Examining Attorney, as well as

the specimens submitted by applicant with its application, establish this. The term sought to be registered is clearly a geographic name and has no other significance. This satisfies the first part of the test").

Next, we must consider whether the goods and services come from the area and whether the public would make a goods/place[2] association; that is, would the public be likely to believe that the goods or services originate in the place named in the mark. When "there is no genuine issue that the geographical significance of a term is its primary significance and where the geographical place is neither obscure nor remote, a public association of the goods with the place may *ordinarily be presumed* from the fact that the applicant's own goods come from the geographical place named in the mark." *Handler Fenton*, 214 USPQ at 850 (emphasis added). Therefore, when goods come from a specific geographic location, that is normally enough to find a goods/place relationship. *Compagnie Generale Maritime*, 26 USPQ2d at 1655 ("We likewise hold that the Board did not clearly err in finding that 'France, a major manufacturing and commercial nation, would be perceived as the source of the numerous goods and services

---

[2] Or services/place.

7

listed in the applications if the mark is primarily geographical'") and *In re JT Tobacconists*, 59 USPQ2d 1080, 1084 (TTAB 2001) ("[W]e find that a goods/place association exists in that customers for applicant's goods would believe that its cigars, cigar cases and humidors are manufactured in the State of Minnesota and that, because applicant's goods do indeed come from such state, its mark is primarily geographically descriptive of its goods").

We have no evidence that Montecito is a well-known geographic location, such as France, from which we could assume that a wide variety of goods and services originate. *Compagnie Generale Maritime*, 26 USPQ2d at 1655. Here, the examining attorney argues that:

(1) "applicant is located in Montecito, so applicant's goods and services do or will originate in Montecito; and purchasers would indeed be likely to believe that the goods and services originate in Montecito" (Brief at unnumbered p. 3; See also Brief at 5), and

(2) "Since applicant lives in Montecito the mark is closely connected to applicant's goods and services" (Brief at 6).

In addition, the examining attorney also points to applicant's street address in Montecito and argues that "the public is likely to believe that the mark identifies

the place from which the goods and services originate."

Brief at 6.  However, the mere fact that applicant sleeps in Montecito is not necessarily enough to establish a goods/place relationship.  Indeed, even the location of a corporate headquarters is not necessarily sufficient to show a goods/place relationship.  *In re John Harvey & Sons Ltd*., 32 USPQ2d 1451, 1454 (TTAB 1994) ("The mere fact that applicant's headquarters are in Bristol, England does not mandate a finding here that a goods/place association should be presumed").  In another case, applicant applied to register the mark LAUDERDALE FARM for meats and poultry. The fact that applicant was located in Lauderdale, Alabama, did not establish a goods/place relationship.

> That reference indicates only that it [Lauderdale County, Alabama] is a cotton-growing area and makes no reference to any of the products [meats and poultry] for which applicant now seeks to register the mark LAUDERDALE FARM.  Even assuming that the facts set forth in the Gazetteer are common knowledge, an assumption we find difficult to accept, the evidence is insufficient to support any public association on the part of the public of the term "Lauderdale" with fresh processed meat and poultry products.

*In re Consolidated Foods Corp.*, 218 USPQ 184, 186 (TTAB 1983).  *Accord In re Gale Hayman Inc*., 15 USPQ2d 1478, 1479 (TTAB 1990) (footnote omitted):

> The mere fact that applicant's principal offices are in Century City, close to Sunset Boulevard, does not mandate a finding that a goods/place association should be presumed.  Sunset Boulevard itself would

9

> have to be associated with the products in such a way that the consuming public would be likely to assume that Sunset Boulevard was the place in which the perfume and cologne originated. Nothing in the record, however, indicates or even suggests that purchasers would believe that Sunset Boulevard was the place of manufacture or production of the perfume and cologne. Indeed, there is no indication that any perfume or cologne is manufactured or produced on Sunset Boulevard.

See also *West End Brewing Co of Utica, N.Y. v. South Australian Brewing Co.*, 2 USPQ2d 1306, 1309 n.4 (TTAB 1987) ("Applicant contends that the term 'WEST END' is primarily geographically descriptive as applied to opposer's beer and that opposer has failed to prove secondary meaning. The only evidence offered in support of this contention is that opposer's plant is located in the west side, or 'west end,' of the city of Utica, New York. This evidentiary showing falls far short of what would be necessary, under the case law, to establish that this term, as applied to opposer's beer products, is primarily geographically descriptive of them").

Indeed, while the board has found in the NANTUCKET NECTARS case that the products did not have to be made on the island of Nantucket in order to establish a goods/place relationship, the applicant in that case had a substantial presence in that place. *In re Nantucket Allserve Inc.*, 28 USPQ2d 1144, 1145 (TTAB 1993) ("While it is true that

10

applicant's NANTUCKET NECTARS soft drinks are manufactured in Worcester, Massachusetts, applicant's corporate headquarters and, perhaps more importantly, applicant's center for research and development are located on Nantucket. Thus, a principal origin, if not the principal origin, of applicant's products is Nantucket") (citation to record omitted). *See also In re Steel House, Inc.*, 206 USPQ 956 (TTAB 1980) ("San Jose" held to be geographically descriptive for applicant's services (retail store services for ornamental metal) when applicant's place of business and its services are in San Jose, California).

In this case, we have no evidence regarding applicant's presence in Montecito. The only suggestion of a goods/place relationship with Montecito is the fact that the examining attorney asserts that "applicant lives in Montecito."[3] Brief at 6. Applicant argues that diets "don't really hail from anywhere, and even though the Examining Attorney correctly points out that Applicant's goods include booklets, pamphlets and the like, it is more likely to believe that they are printed in a place other than Southern California… [P]rospective consumers of

---

[3] This application is based on an intent to use. It is of course possible that applicant's specimens and/or his advertising for the goods and services may demonstrate a connection with Montecito, California, which is not apparent now.

Applicant's information would care little about the source of origin, but rather, are interested in the information itself." Reply Brief at 2. The examining attorney argues that "the goods and services identified in the application are not 'diets.'" Brief at 7.

A place does not have to be noted for a product to establish that a term is geographically descriptive. *JT Tobacconists*, 59 USPQ2d at 1084 ("There is no requirement… that the State of Minnesota be noted for cigars and cigar products in order for a mark such as 'MINNESOTA CIGAR COMPANY' to be held primarily geographically descriptive"). In this case, however, not only do we not have any evidence that books and publications originate in Montecito, but we have no specific evidence that applicant's publications will originate in Montecito. We add that there is also no evidence that the public would believe that applicant's on-line journals and health information services originate from applicant's home or even some other location in Montecito. *See John Harvey & Sons*, 32 USPQ2d at 1454 ("For 'Bristol' to be primarily geographically descriptive of applicant's cakes, Bristol, England would have to be associated with cakes flavored with sherry wine in such a way that the American public would be likely to assume that Bristol, England was the place in which these cakes

originated"). Applicant's blogs, providing health care information services, and global computer websites are not services necessarily "tied to a particular location." 2 *McCarthy on Trademarks and Unfair Competition* (4th ed. 2008), §14:29. Without evidence that applicant provides these services from a public location in Montecito, it would be speculation on our part to reach the conclusion that the goods or services originate there or that the public would understand that there is a goods/place relationship.[4]

We note that this case is not the same as the *MCO* case where the board found that "Fountain Hills" was primarily geographically descriptive for real estate services.

> Even if the association between this place name and the services set forth in the application would not be assumed, despite the fact that applicant actually renders its services there, the record here supports that such an association is made by people in the real estate market where applicant is using the term. That is to say, unlike goods, which can be manufactured in some remote or obscure location and then shipped all over the world, real estate development services are rendered in particular geographic areas which are being developed. In this case, the services for which applicant seeks to register "FOUNTAIN HILLS" are in fact rendered in Fountain Hills.

> Clearly, anyone who comes in contact with applicant's promotional brochure (which was submitted as a

---

[4] We add that we have no evidence that publications and services about diets are geographically described by the home of the author of the diet, the location of some of the participants in the diet program, or the mailing address of the individual author.

13

specimen) will recognize the connection between the mark "FOUNTAIN HILLS" and the name of the place where applicant is offering its real estate development services, Fountain Hills. The brochure is replete with references to Fountain Hills as the town where applicant's development services are rendered. Examples include the following: "Fountain Hills is home to…; it is a hometown with its own government, school system, and a public library…. All this makes Fountain Hills one of the most desirable communities in Arizona…. In Fountain Hills, you can be part of a community…. As a resident of Fountain Hills, you can enjoy…. Come spend the day at Fountain Hills." These uses of the term by applicant hardly show use of "FOUNTAIN HILLS" as an indication of the source of applicant's real estate development services. Rather, they evidence use of the term as the name of the place where the services are rendered.

*MCO*, 38 USPQ2d at 1156.

Unlike "Fountain Hills" for real estate development services in Fountain Hills, Arizona, there is no connection between Montecito and applicant's goods and services other than applicant's address. The limited information in this application does not convince us that applicant's goods or services originate in Montecito, California, or that the public will assume that these goods or services are from Montecito. We find that the examining attorney has not met his burden of showing the mark THE MONTECITO DIET is primarily geographically descriptive for applicant's goods and services. *Accord In re Consolidated Specialty Restaurants, Inc.*, 71 USPQ2d 1921, 1924 (TTAB 2004) ("It is well established that the USPTO has the burden of

14

establishing a *prima facie* case that the mark is primarily geographically deceptively misdescriptive").

DECISION:  The refusal to register applicant's mark for the identified goods and services is reversed.